**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

KHALID YAHIA IBRAHIM
fdba ADVANCE MEDICAL TRANSPORTATION
fdba DUBAI HOOKAH LOUNGE

                    Debtor

        AZAAM ALMASUDI

                Plaintiff

            v.

        KHALID YAHIA IBRAHIM

                Defendant

Case No. 3:16-bk-32406-SHB
Chapter 7

Adv. Proc. No. 3:16-ap-3034-SHB

**M E M O R A N D U M**

**APPEARANCES:**   WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
                E. Brian Sellers, Esq.
                First Tennessee Plaza
                Suite 1000
                800 South Gay Street
                Post Office Box 2428
                Knoxville, Tennessee  37901-2428
                Attorneys for the Plaintiff

                LAW OFFICES OF MAYER & NEWTON
                John P. Newton, Jr., Esq.
                1111 Northshore Drive
                Suite S-570
                Knoxville, Tennessee  37919
                Attorneys for the Defendant

**SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE**

Plaintiff filed a Complaint to Determine Dischargeability of Debt and for Judgment for Damages for Fraud and/or Conversion ("Complaint") [Doc. 1] on November 18, 2016, asking the Court to grant him a nondischargeable judgment against Defendant for actual damages of $28,000.00, treble or punitive damages in a minimum amount of $100,000.00, pre- and post-judgment interest, attorneys' fees, and expenses pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). Defendant timely answered [Doc. 6], denying Plaintiff's allegations of fraud and Plaintiff's entitlement to a nondischargeable judgment against him.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Trial was held on September 22, 2017.  The record before the Court consists of forty-four exhibits entered into evidence; the deposition testimony of Ryan Grubb; and the trial testimony of Plaintiff, Defendant, and Ernest Wombles.  The Court also takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of undisputed facts of record in Defendant's Chapter 7 bankruptcy case.

For the reasons set forth in this Memorandum, the Court finds that Plaintiff is entitled to a nondischargeable judgment under 11 U.S.C. § 523(a)(2)(A) and (a)(6).  Plaintiff will be awarded a judgment in the total amount of $84,000.00, consisting of $28,000.00 in actual damages and $56,000.00 in punitive damages.

## I.  BACKGROUND FACTS

Plaintiff is a student at the University of Tennessee, majoring in chemical engineering.  A citizen of Saudi Arabia, he came to Tennessee on a student visa in August 2014, with approximately $55,000.00 in proceeds from the sale of his house in Saudi Arabia.  Plaintiff met Defendant at the Dubai Hookah Lounge (the "Lounge"), which was located on Cumberland

Avenue, in the midst of the University of Tennessee campus area.  The two men became friends

and eventually discussed Plaintiff making an investment in the Lounge.

On November 17, 2014, Plaintiff and Defendant met with Ryan Grubb, branch team

leader with the Cumberland Avenue branch of Regions Bank.  During this meeting, Plaintiff

offered a cashier's check in the amount of $28,000.00 [Trial Ex. 6] that was deposited into a

checking account in the name of "Dubai Hookah and Lounge Corp Kitchen & Alcohol" (the

"K&A Account"). [Trial Exs. 6, 7, 9.]  Defendant identified himself on the K&A Account

signature card as "President" of "Dubai Hookah and Lounge Corp," which was identified as an

LLC.  [Trial Ex. 7.]  Defendant was the only authorized signatory on the K&A Account. [Trial

Ex. 7.]

Plaintiff was not repaid any funds by Defendant, notwithstanding requests made on

numerous occasions over the next several months, culminating in a formal demand to Defendant

for repayment of the $28,000.00 by a letter dated September 23, 2015. [Ex. D to Trial Ex. 2.]

Subsequent to this demand and his discovery through a newspaper article that the Lounge was

having safety and financial problems [*see* Trial Ex. 36], Plaintiff filed *Azaam Almasudi v. Khalid

Y. Ibrahim, individually and/or d/b/a Dubai Hookah and Lounge Corp., a/k/a Dubai Hookah

Lounge and Dubai Hookah and Lounge Corporation*, No. 190624-3, in the Knox County

Chancery Court on November 12, 2015 ("State Court Lawsuit"), seeking repayment of the

$28,000.00, punitive damages, and attorney's fees. [Trial Ex. 26.]  Defendant filed an answer to

the State Court Lawsuit four months later, denying any liability. [Trial Ex. 27.]  Because

attempts to take Defendant's deposition in the State Court Lawsuit were unsuccessful, Plaintiff

sought discovery sanctions against Defendant, but those proceedings were stayed when

Defendant filed his Chapter 7 bankruptcy petition on August 12, 2016.[1] [*See* Coll. Trial Ex. 28.]

Plaintiff filed a proof of claim in the amount of $28,000.00 on September 16, 2016

[Claim No. 2-1], and he timely initiated this adversary proceeding.  Pursuant to the Joint Pretrial

Statement filed on September 12, 2017 [Doc. 16], the primary issues are (1) whether Defendant

obtained the $28,000.00 by false pretenses, false representations, and/or actual fraud such that

the debt is nondischargeable under § 523(a)(2)(A); (2) whether Defendant willfully and

maliciously converted the $28,000.00 such that the debt is nondischargeable under § 523(a)(6);

and (3) whether Plaintiff is entitled to a judgment against Defendant in the amount of $28,000.00

plus punitive damages and/or attorneys' fees and expenses.[2]

## II.  LAW AND ANALYSIS

In order to accomplish one of the Bankruptcy Code's primary goals – relieving "honest

but unfortunate debtors" from their obligations to facilitate a "fresh start" – Chapter 7 debtors are

entitled to a discharge of their pre-petition debts "[e]xcept as provided in section 523[.]" 11

U.S.C. § 727(b); *Buckeye Ret. Co., LLC v. Heil (In re Heil)*, 289 B.R. 897, 901 (Bankr. E.D.

Tenn. 2003) (citations omitted).  The Court construes § 523(a) liberally in favor of Defendant

and strictly against Plaintiff, who bears the burden of proving all of the elements of each

subsection by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991);

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.

1998).

---

[1] Defendant received a discharge on November 29, 2016. [Doc. 19.]

[2] Plaintiff also claims that Defendant's conduct constituted a violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 – -131 ("TCPA"), such that Plaintiff is entitled to actual and treble damages as well as attorneys' fees and that, to the extent necessary, any corporate veil between Dubai Hookah and Lounge Corporation and Defendant should be pierced under Tennessee law.  As explained below, the Court finds it unnecessary to pierce the corporate veil and finds the TCPA inapplicable to the transaction at issue.

## A.  11 U.S.C. § 523(a)(6)

Plaintiff argues that Defendant converted Plaintiff's $28,000.00, thus entitling him to a nondischargeable judgment under § 523(a)(6). To prevail under this subsection, Plaintiff must prove (1) the existence of "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury[,]" *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), and (2) that Defendant either desired to cause the consequences of his actions or believed with reasonable certainty that such consequences would occur. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).  In the Sixth Circuit, "unless the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it, he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Id.* at 464 (citations omitted); *see also Guthrie v. Kokenge (In re Kokenge)*, 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002).  "That a reasonable debtor 'should have known' that his conduct risked injury to others is simply insufficient.  Instead, the debtor must 'will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.'" *In re Kokenge*, 279 B.R. at 543 (quoting *In re Markowitz*, 190 F.3d at 465 n.10).  Furthermore, "the injury must invade the creditor's legal rights." *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. June 30, 2004).[3]

"[I]t is well settled that actions of conversion may serve [as] the basis for a determination of nondischargeability under § 523(a)(6) . . . ." *First Nat'l Bank v. Simerlein (In re Simerlein)*, 497 B.R. 525, 544 (Bankr. E.D. Tenn. 2013).  Conversion, as defined under Tennessee law is

---

[3] "The Sixth Circuit has developed a non-exclusive list of 'types of misconduct [that] satisfy the willful and malicious injury standard:  intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises.'" *MD Acquisition, LLC v. Myers (In re Myers)*, No. 11-6092, 2012 WL 6761356, at *8 (Bankr. N.D. Ohio Dec. 31, 2012) (quoting *In re Best*, 109 F. App'x at 5 & n.2).

"the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property." *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009). Proof that a conversion occurred, however, does not, without more, satisfy the requirements of § 523(a)(6). *See Jenkins v. Schmank (In re Schmank)*, 535 B.R. 243, 264 (Bankr. E.D. Tenn. 2015). "Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur." *In re Simerlein*, 497 B.R. at 544.

"While willfulness and malice may often exist concurrently in the same set of facts, each is a distinct element in the § 523(a)(6) analysis; both requirements must be met to warrant a determination of nondischargeability." *Schafer v. Rapp (In re Rapp)*, 375 B.R. 421, 436 (Bankr. S.D. Ohio 2007). Concerning the willfulness element, the Supreme Court looked to Black's Law Dictionary to define "willful" as "voluntary," "intentional," and "deliberate" and compared proof of the willfulness requirement – that the actor intended not merely to act but to cause the consequences of the act – to proof of an intentional tort. *Geiger*, 523 U.S. at 61-62 & n.3. Accordingly, "[a]n act will be deemed 'willful' only if it was undertaken with the actual intent to cause injury," *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007).

A court, thus, must "look into the debtor's mind, subjectively" to determine whether a defendant-debtor "intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act." *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004). "Proof of willful behavior must often be demonstrated through the use of circumstantial evidence . . . [that] can 'be indirectly established

6

by the creditor demonstrating the existence of two facts:  (1) the debtor knew of the creditor's . . .

rights; and (2) the debtor knew that his conduct would cause injury to those rights.'" *In re

Schmank*, 535 B.R. at 264 (quoting *J&A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 802

(Bankr. N.D. Ohio 2001)).

As to the element of malice, "[a] person has acted 'maliciously' when that person acts 'in

conscious disregard of his duties or without just cause or excuse.'" *HER, Inc. v. Barlow (In re

Barlow)*, 478 B.R. 320, 330 (Bankr. S.D. Ohio 2012) (citations omitted).  "A party may establish

malice for purposes of § 523(a)(6) by showing 'that (1) the debtor has committed a wrongful act,

(2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there

is no just cause or excuse for the action.'" *Vicars v. Freeman (In re Freeman)*, No. 11-5028,

2013 WL 4447007, at *17 (Bankr. E.D. Tenn. Aug. 16, 2013) (quoting *JP Morgan Chase Bank,

NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010) (citations omitted)).

"There is no requirement that the person act with ill will, spite, or animosity toward the injured

party," *In re Rapp*, 375 B.R. at 436, but "[m]ere negligence is not sufficient to except a debt

from discharge under § 523(a)(6)." *In re Fox*, 370 B.R. at 119.

Based on the record, the Court finds that Defendant's personal use of the $28,000.00

received from Plaintiff, to the exclusion of Plaintiff and Plaintiff's expressed desired use for

those funds, constituted conversion as defined under Tennessee law.  The Court also finds that,

even in light of the requirement to construe § 523(a) liberally in Defendant's favor and strictly

against Plaintiff, Defendant's conversion of Plaintiff's $28,000.00 was willful and done with

malice and an intent to harm Plaintiff by Defendant's orchestration of an elaborate scheme to

convince Plaintiff to "invest" money in the Lounge when Defendant knew that the business was

struggling (in part due to his spending habits) and when Defendant intended to use the money to perpetuate his lavish lifestyle.

As an initial matter, the Court found Plaintiff to be extremely credible; on the other hand, Defendant's testimony was not credible. Not only did Defendant's trial testimony contradict most of Plaintiff's testimony, but Defendant also contradicted his own deposition testimony, sworn discovery responses, and sworn bankruptcy schedules and statements.

Plaintiff testified that he was 24 years old when he came to Knoxville from Saudi Arabia. He began hanging out at the Lounge for the music, dancing, late hours, and fellowship with other students from various nationalities. He met Defendant soon after he arrived in Tennessee, and he quickly came to consider Defendant a close friend. Plaintiff testified that Defendant expressly represented that, and acted like, he owned the Lounge. Plaintiff also testified that Defendant appeared successful because he dressed well and drove a nice car and that Defendant regularly bragged to Plaintiff and on social media about his success and his wealth, as well as that his wife was Dolly Parton's niece. Plaintiff and others also accompanied Defendant on trips to Nashville, Cookeville, and Washington, D.C.

At some point, Plaintiff expressed an interest generally in making investments in order to grow his limited funds and better support himself in case he was not awarded a scholarship from the Saudi Arabian government to continue his studies. Defendant planted a seed with Plaintiff about how a friend of Defendant's regretted having passed on an opportunity to invest in the Lounge before it opened. A few days after that particular discussion, Defendant asked Plaintiff for the first time if he wanted to invest his money in renovating the Lounge to put in a kitchen, which Defendant said would cost approximately $30,000.00.[4]

---

[4] Plaintiff testified that although he seeks only $28,000.00 in actual damages, he also gave Defendant $2,000.00 that was needed for "cash flow" to buy "supplies for the lounge" before the weekend. As a result, when Plaintiff later

During the initial conversation with Defendant about investing in the Lounge to add a kitchen, Plaintiff told Defendant that he did not think it would be a good idea to invest, expressing his concern that making such an investment might affect his immigration status and harm his student visa. Plaintiff then researched the issue more and discovered that it was complicated. When he again told Defendant that he did not want to invest because of his immigration concerns, Defendant told Plaintiff not to worry, that Defendant had a lawyer, and that making investments was not the same as working a job so that it would not affect Plaintiff's immigration status.

When Plaintiff expressed continued reluctance given the amount of money, Defendant offered to open a new bank account with both men having access so that Plaintiff could monitor the account. Defendant promised Plaintiff 30% of the profits realized from the Lounge after the kitchen was added. Based on Defendant's representations and assurances, Plaintiff agreed to invest $28,000.00. Plaintiff acknowledged at trial that he never asked Defendant to produce any financial records for review before making any decisions about investing and that there was no written agreement nor any offer of stock in the corporation.

Plaintiff testified that, approximately two weeks after they initially agreed that Plaintiff would invest in the Lounge, Defendant called Plaintiff to arrange for the funds transfer. Plaintiff testified that Defendant accompanied him to Bank of America on Cumberland Avenue, where Plaintiff had an account, to get a cashier's check for $28,000.00, which Defendant directed Plaintiff to make payable to Dubai Hookah and Lounge Corp. Plaintiff then accompanied

---

obtained the cashier's check, Defendant instructed Plaintiff to make it out for $28,000.00 because of the $2,000.00 that Plaintiff had already provided.

Defendant to Regions Bank, where Defendant already had a business account for the Lounge, in order to open the new K&A Account.

At Regions Bank, the two of them met with Mr. Grubb, who opened the K&A Account with Defendant as the only signatory to the account.  Plaintiff testified that Defendant had assured him before opening the account that it would be joint so that Plaintiff could monitor the funds and even have an access card, but because of Plaintiff's limited understanding of the English language at the time, he was unaware until later (when he did not receive an access card) that Defendant had opened the K&A Account without authorizing Plaintiff to have access.

For his part, when asked at trial about his promises concerning Plaintiff's access to the K&A Account, Defendant testified at trial that he "didn't mention stuff like that" and that he did not remember telling Plaintiff that he would have access to the account.  In his deposition, however, Defendant testified that although there was some discussion about giving Plaintiff authority to access the account, he could not remember the details:

> A.  The discussion we – we had a lot of discussion.  You know, he's going to access the account and – because, you know, whether he's going to do partnership, or was this going to be like a loan to the business.  That's what it was.  But I don't – I don't remember in details what it was because it's been a while now.
>
> Q.  Did you tell [Plaintiff] he was going to have access to the account?
>
> A.  Yeah.
>
> Q.  Or at least be able to . . . monitor it?
>
> A.  Yeah.  Yeah.  I told him, yeah.
>
> . . . .
>
> Q.  But that didn't happen?
>
> A.  Yeah – because he change [*sic*] his mind.  He doesn't want to be a partner.

Q.   Well, but from the git-go he was not – you did not sign him up for access or anything?

A.   I don't remember.  I don't remember things.

[Trial Ex. 1, Def.'s Dep. at pp. 115-16.]  Defendant testified at trial that the $28,000.00 was supposed to have been used for renovations but that he only changed tiles in the Lounge, painted, and bought items from a neighboring business that was closing to be used to further renovate the Lounge.  Yet, no further renovations were made to the Lounge.

Plaintiff testified that he trusted Defendant as his close friend and believed, based on Defendant's representations, that both Defendant and the Lounge were very successful. Although Defendant testified at trial that he and Plaintiff had not agreed to put anything in writing, he testified at deposition that they had discussed having a lawyer draw up paperwork but then Defendant decided not to involve a lawyer after the money was transferred "because there's a trust."  [Trial Ex. 1, Def.'s Dep. at p. 70.]

Plaintiff testified that he first questioned Defendant about the investment the day after the K&A Account was opened because Defendant posted on social media that he was looking for a new car.  Plaintiff immediately called Defendant to ask if he was using Plaintiff's money to buy a car, and Defendant told Plaintiff, "[N]o and just to relax."  Plaintiff went to Regions Bank to ask about getting the access card and was informed that he could not get a card.  When Plaintiff asked Defendant about getting the account access card, Defendant told him that if he had put Plaintiff's name on the account, it would be complicated and Plaintiff could get into trouble and that Defendant did not want to be involved in immigration troubles with Plaintiff.

Thereafter, Plaintiff regularly tried to contact Defendant to ask about the kitchen renovation.  Defendant replied that he was "working on it" and that Plaintiff was annoying.

Finally, in response to repeated inquiries from Plaintiff, Defendant sent Plaintiff an estimate for

$10,866.00 received from Air Maintenance, LLC [*see* Trial Ex. 23; Trial Ex. 24] and told

Plaintiff to stop bothering him about it.  After receiving the estimate from Defendant, Plaintiff

stopped calling Defendant to inquire, but he continued going to the Lounge to check on the

kitchen.  Although he saw where the floor had been repaired, Plaintiff never saw evidence of a

kitchen renovation nor any evidence of kitchen equipment that Defendant said he had purchased.

Plaintiff eventually reinitiated efforts to reach Defendant, who reported that he had paid

an attorney $4,000.00 to write up their agreement as an investment and that the agreement was in

Defendant's car but that he was too busy to come to Plaintiff and sign it.  At the same time,

Plaintiff continued to see social media posts by Defendant showing him to be partying, including

a post while Defendant was in Washington, D.C., saying that he had $6,000.00 in hand for a

party night.

In early 2015, Plaintiff's brother in Saudi Arabia experienced some difficulty with which

Plaintiff believed he could help if he could get his money back from Defendant.  In May,

Plaintiff contacted Defendant via text message, informing him how worried Plaintiff was about

the situation and asking Defendant to repay the money.  Defendant replied the next day, at 5:18

a.m., "Okay soon.  I just woke up!" [Trial Ex. 37.]  At some point, Defendant said that he would

pay $500.00 monthly; however, he put nothing in writing and made no payments, prompting

Plaintiff to send a text in August, stating, "Khalid please start paying me back my money.  I

waited enough!!!  This is Azaam by the way!" [Trial Ex. 37.]

Because Defendant continued to be non-responsive and never repaid any of the money,

Plaintiff finally hired legal counsel, who sent a demand letter to Defendant for payment on

September 23, 2015. [Ex. D to Trial Ex. 2.]  Plaintiff testified that Defendant called him after

receiving the demand letter and, claiming they were "brothers," asked him to drop any legal

action. Defendant also asked Plaintiff to drop the State Court Lawsuit after it was filed on

November 12, 2015. Plaintiff further testified that during conversations when they have seen

each other at other establishments since late 2015, Defendant told Plaintiff that he "could" repay

the $28,000.00 but does not want to because of the lawsuits.

In the meantime, as discussed in a newspaper article on the front page of the Knoxville

News-Sentinel, safety concerns arose after a fatal shooting occurred in the lot just behind the

Lounge in November 2015. [*See* Trial Ex. 36.] At some point after the shooting, the City of

Knoxville closed the Lounge as "unfit for human habitation." [*See* Trial Ex. 21.] Defendant,

however, testified that the Lounge was closed because business waned as a result of the

construction on Cumberland Avenue, cutting into revenues such that Defendant had failed to pay

sales taxes to the State of Tennessee. [*See* Trial Ex. 25.] Defendant also testified that he owed

money to the landlord, AMU Properties.

Defendant does not deny that he has repaid none of the $28,000.00. In an effort to cast

doubt on his personal liability to Plaintiff for the $28,000.00, Defendant testified that he simply

ran the Lounge for his brother, who actually owned the business because his money (not

Defendant's) funded it. Defendant explained that his brother could not obtain a visa to come to

the United States and that Defendant started the business with funds that his brother transferred

from his personal account to Defendant's personal account. Defendant also acknowledged that

he personally set up the corporation, that he obtained the business license, that he opened the

original bank account in 2012, and that he arranged the original lease prior to the company's

incorporation. In fact, corporate records from the Tennessee Secretary of State reflect that

Defendant was Registered Agent, President, and the sole Director of the Lounge [*see* Coll. Trial

Ex. 44], which was administratively dissolved by the state on August 8, 2015 [*see* Coll. Trial Ex. 2 at pg. 00099]. Defendant also acknowledged at trial that he had held himself out as president and manager of the Lounge not only to Plaintiff but also to other patrons and members of the business community. [*See, e.g.* Trial Ex. 40.]

The Court also finds telling the deposition testimony of Mr. Grubb, the Regions Bank employee who met with Defendant to open the K&A Account, who spoke of knowing Defendant in a business capacity "the entire time that he had had the Hookah Lounge[.]" [Trial Ex. 30 at pg. 7, lines 7-8.] More importantly, with respect to the $28,000.00 payment, Defendant endorsed the back of the cashier's check personally and in his individual name, not as or on behalf of the Lounge. [Trial Ex. 9, p. 00175.]

Moreover, Defendant's bankruptcy schedules, signed under penalty of perjury, reflect the following facts:

- the Petition reflects "FDBA Dubai Hookah Lounge" as a business name Defendant used in the last eight years [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 2), p. 00308];

- the Petition reflects that he was the sole proprietor of "fdba Dubai Hookah Lounge" [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, pp. 4, 8), pp. 00310, 00314];

- the Statement of Financial Affairs reflects that his source of income for 2014 through 2016 derived from operating a business [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 11), p. 00317];

- the Statement of Financial Affairs reflects that he operated as a sole proprietor of or was self-employed under the business "fdba Dubai Hookah Lounge" from October 2012 to March 2016 and also "Dubai Hookah & Lounge Corp." [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 16), p. 00322];

- Defendant identified on Schedule E/F a priority debt owed to the Tennessee Department of Revenue for "business taxes" from 2015 [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 29), p. 00335];

- Defendant identified on Schedule E/F the debt owed to Plaintiff, and he failed to mark it as contingent, unliquidated, or disputed [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 30), p. 00336]; and

- Defendant listed on Schedule E/F a general unsecured debt owing to A Z International Fine Rugs for "business debt – rent" [Trial Ex. 28 (Case No. 3:16-bk-32406-SHB, Doc. 1, p. 30), p. 00336].[5]

Thus, the overwhelming weight of the evidence shows that Defendant owned the Lounge as a sole proprietorship so that the debt he owes to Plaintiff is an individual liability.[6]

The fact of conversion is also clear from the evidence. Defendant appropriated Plaintiff's $28,000.00 for his own use by exercising dominion over it in defiance of Plaintiff's stated purpose and while refusing to return it. *See Ralston*, 306 S.W.3d at 221.

As for whether Plaintiff adequately proved under § 523(a)(6) that he suffered a willful and malicious injury from Defendant's conversion of the $28,000.00, the answer is yes. Defendant, after promising Plaintiff that he would have access to the K&A Account, opened the account with Defendant having sole signatory authority and the only debit card. Within forty-six days of account opening, the entire $28,000.00 was depleted from the account as a result of Defendant transferring $19,750.00 to his other Lounge bank account, withdrawing $4,000.00 cash (the day after the account was opened), and writing three checks totaling $4,750.00, of which $3,800.00 was a rent check to the Lounge's landlord.[7]  [Trial Exs. 8, 9, 10.] Defendant testified that he transferred the funds from the K&A Account to the Dubai Hookah and Lounge Corp business account (the "Lounge Business Account") because it was

---

[5] Defendant admitted at trial that this creditor is the same as AMU Properties, the landlord for the Lounge to which a $3,800.00 check was written for "rent" on the K&A Account in November 2014.

[6] For this reason, the Court finds it unnecessary to pierce any corporate veil.

[7] Additional debits from the account included $59.98 for a check order and $100.00, shown on the statement as a garnishment. [Trial Ex. 8, 10.]

"complicated" and "confusing" for him to have more than one account.  Notably, he asserted that

he transferred funds to the Lounge Business Account because did not have checks for the K&A

Account, but the bank records reflect that he not only ordered and paid for checks, but he wrote

three checks from that account in the first fifteen days after depositing Plaintiff's cashier's check.

    Defendant would have the Court believe that his personal use of the funds was merely his

compensation as an employee of the Lounge.  He testified during his deposition that "about 20

percent [of the expenditures from the Lounge Business Account] are personal because, you

know, this is sort of pay for me as well." [Trial Ex. 1 at pg. 142, lines 18-22.]  At trial, Defendant

acknowledged that he took money from his various accounts, with some spent on business

expenses and tax write-offs, some spent for merchandise, and some spent on his personal

expenses as his compensation.[8]  Indeed, Defendant solely controlled the Lounge Business

Account and regularly used a debit card, which his wife also used.  A review of the bank records

for the Lounge Business Account into which Defendant transferred $19,750.00 of Plaintiff's

$28,000.00 payment, reflects that significantly more than 20% of the expenditures were for

personal household and entertainment expenses,[9] and other significant debits were for

"unknown" purposes, according to Defendant's trial testimony. [Trial Exs. 14-20.]  Defendant

testified that he might have used a portion of the K&A Account transfers to pay cash to his

---

[8] Defendant testified that although he considered use of the money compensation, he was unsure if he had ever paid taxes on or reported this as income on his personal tax returns.  His 2015 tax return, filed jointly with his wife, shows combined household income of $19,672.00, all of which was reported on his W-2 from Dubai Hookah and Lounge Corp. [*See* Trial Ex. 43.]

[9] For example, as evidenced by the bank statement for the Lounge Business Account dated November 1 through November 28, 2014, charges for Crossfit ($65.45); gas stations (at least $191.26); restaurants (at least $114.78); hotels ($386.01); clothing and other retailers (at least $495.61); undescribed PayPal transactions (totaling $180.65); a car dealership ($234.38); and other undescribed debits (totaling $660.74) that do not appear to be business-related were debited from that account, which had a beginning balance of <$235.37> and an ending balance (after transfers from the K&A Account totaling $6,000.00) of $2,922.11. [Trial Ex. 14.]  Additionally, Defendant and his wife made cash withdrawals, inclusive of fees, totaling $1,325.00 ($1,025.00 by Defendant; $300.00 by his wife) between November 20 and November 28. [Id.]  Subsequent bank statements for the Lounge Business Account reflect similar personal expenses and cash withdrawals in even higher amounts. [Trial Exs. 16-20.]

16

employees but that all of his financial books and records were in the building where the Lounge
operated and he was not allowed to re-enter the building to retrieve the records.  At bottom,
Defendant admitted that although some of the funds in the Lounge Business Account went to
business expenses, none of it was spent to renovate the Lounge to add a kitchen.

The Court finds utterly unbelievable Defendant's denial at trial that he ever told Plaintiff
that the $28,000.00 was solely to set up a kitchen.  At his deposition, Defendant first testified
that the money he was getting from Plaintiff was supposed to go toward buying kitchen and
alcohol equipment "to do a restaurant" [Trial Ex. 1 at pg. 61, line 14 – pg. 62, line 5], but then he
contradicted that testimony by stating that the money was "[f]or the business . . . [and] not
necessary [sic] for the kitchen." [Trial Ex. 1 at pg. 62, lines 6-15.]  The fact that the account was
called the "Kitchen & Alcohol" account speaks volumes.  Were it simply intended as an
investment account, there would have been no reason to call it the "Kitchen & Alcohol" account
– in fact, there would have been no reason to create a wholly separate account.  The Court also
does not believe Defendant's assertions that when he opened the account, Regions "just want
[sic] a name," and that "[it] just has to be something – I told [Grubb] the first thing pop out [sic]
of my mind. It was for the kitchen, to increase – I don't know if – I could have said remodeling
or anything. . . .  [H]e just wanted to say anything to open the account." [Trial Ex. 1 at pg. 62,
line 10 – pg. 63, line 4.]  Instead, the Court concludes from the evidence that the reason
Defendant opened a separate account was to lead Plaintiff to believe that his $28,000.00 would
be segregated for use on a kitchen renovation in an account that he could monitor.

Telling also is the fact that after Plaintiff began questioning Defendant about the money
and whether he was making any progress on the kitchen renovations, Defendant obtained a free
estimate from Air Maintenance, LLC for $10,866.00 for kitchen renovations and provided it to

Plaintiff to appease him.  Defendant, however, never took any action or contacted Air

Maintenance, LLC or any other company to actually perform any renovations to install a kitchen

in the Lounge.  Although Defendant testified that he changed tiles in the Lounge, painted, and

bought equipment from a neighboring business that was closing, he could not produce any

records to prove that any such renovations or purchases were made.  Nor do any of the bank

records show that any of the money obtained from Plaintiff was used for any such purchases or

renovations.[10]  Defendant's claim that all of his financial records are locked in the building

where the Lounge operated and that he has been denied access to them is unconvincing,

especially in light of his contradictory testimony that because it was a "family business," he did

not have to be detailed in his record-keeping.

   In sum, the bank statements reflect that Defendant spent a lot of money to maintain a

very lavish lifestyle and that a large amount of the money that was supposed to be for

renovations of the Lounge, including Plaintiff's $28,000.00, was spent instead by Defendant

solely for his personal and household use.  The Court can easily deduce that Defendant took

Plaintiff's $28,000.00 with the intention of spending it on whatever *he* wanted to spend it on, that

he never had any intention of using the money for the business or to renovate or install a kitchen,

and that he never had any intention of paying anything back to Plaintiff.  Such use was a

conversion under Tennessee law, done willfully and maliciously, with the knowledge that

Plaintiff would suffer harm.  Thus, based on the evidence, Plaintiff is entitled to a determination

of nondischargeability under § 523(a)(6).

---

[10] The December bank statement for the Lounge Business Account shows a debit to Home Depot for $865.04 on December 26, 2014, which could possibly have been to purchase tiles and/or paint supplies [*see* Trial Ex. 16]; however, Defendant pointed to no other entries in the bank records for either the K&A Account or the Lounge Business Account that appear to have been even remotely associated with any sort of renovations.

### B.  11 U.S.C. § 523(a)(2)(A)

Plaintiff has also sought a determination of nondischargeability under § 523(a)(2)(A), by which an individual is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by [] false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).  To satisfy § 523(a)(2)(A)'s requirements, Plaintiff must prove that Defendant obtained money or property from or belonging to Plaintiff through false pretenses and/or material misrepresentations that Defendant knew were false or that he made with gross recklessness or through actual fraud; that Defendant intended to deceive Plaintiff when any such false pretenses, misrepresentations, and/or any such fraud occurred; that Plaintiff justifiably relied on Defendant's false pretenses, representations, and/or fraudulent conduct; and that Plaintiff's reliance was the proximate cause of his losses. *See McDonald v. Morgan (In re Morgan)*, 415 B.R. 644, 649 (Bankr. E.D. Tenn. 2009).  Although there is no dispute that the $28,000.00 deposited into the K&A Account originally belonged to Plaintiff, Defendant has challenged the remaining elements of § 523(a)(2).

Material misrepresentations under § 523(a) are "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (citations omitted); *see also McCallum v. Pixley (In re Pixley)*, 456 B.R. 770, 782 (Bankr. E.D. Mich. 2011) (defining "material fact" to require that it "must be of enough importance in the matter that a reasonable person would be likely to rely on it" (citation omitted)).  Additionally, "[s]ilence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A)." *Fee v. Eccles (In re Eccles)*, 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009) (citation omitted).

19

In the context of § 523(a)(2)(A), "false representations and pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983).  False pretense is an "implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *In re Copeland*, 291 B.R. at 760 (citations omitted).  Thus, "a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A).  Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation." *EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted).  Additionally, "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

Under Sixth Circuit authority, a subjective standard determines fraudulent intent, *In re Rembert*, 141 F.3d at 281, and may be "inferred as a matter of fact" based on the totality of the circumstances when a defendant has engaged in conduct that was "somewhat blameworthy[,]" although mere negligence or evidence of "[a] 'dumb but honest' [debtor] does not satisfy the test." *Copeland*, 291 B.R. at 759, 765-66 (citations omitted).

> A subjective approach, of course, requires that the trier-of-fact focus solely on the individual characteristics of the debtor.  Yet, like an objective approach, a subjective approach still entails the utilization of circumstantial evidence given that a debtor will rarely, if ever, admit to acting in a fraudulent manner; helpful in this regard are many of the traditional indicia of fraud – e.g., a suspicious timing of events, insolvency, transfers to family members or other insiders.  In utilizing such indicia, however, the Sixth Court cautioned against "factor-counting," instead holding "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."

*In re Harrison*, 301 B.R. at 854 (quoting *In re Rembert*, 141 F.3d at 282; other citations omitted).

The determination of nondischargeability often comes down to a defendant's conduct before,

during, and after the representations at issue and witness credibility. *See In re Copeland*, 291

B.R. at 766; *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr.

W.D. Tenn. 2001)).

Finally, the Court must also find justifiable reliance; i.e., that Plaintiff actually relied on

representations made by Defendant, that the reliance was the proximate cause of Plaintiff's

losses, and, based on the facts and circumstances known at the time, Plaintiff's reliance was

justifiable. *See In re Morgan*, 415 B.R. at 649. Justifiable reliance is a subjective standard

"which takes into account the knowledge and relationship of the parties themselves[,]" *Giebel v.*
*Styron (In re Giebel)*, 2014 WL 4346611, at *5 (Bankr. W.D. Wash. Aug. 29, 2014), and "does

not require an investigation, even if the failure to investigate would be considered negligent and

the falsity of the representation would be readily discovered upon investigation." *In re Eccles*,

407 B.R. at 342 (citing *Field v. Mans*, 516 U.S. 59, 70-71 (1995)). In order to find justifiable

reliance, the Court must find that Plaintiff's conduct was not "so utterly unreasonable, in light of

the information apparent to him, that the law may properly say that his loss is his own

responsibility." *Stewart Title Guar. Co. v. Roberts-Dude*, 497 B.R. 143, 151 (S.D. Fla. 2013)

(citation omitted).

Based on the facts set out above, the Court finds that Defendant personally and

individually obtained $28,000.00 from Plaintiff. The Court also finds that Defendant's

representations to Plaintiff that he wanted to use Plaintiff's money to install a kitchen and that

Plaintiff would receive profits from the kitchen business were material misrepresentations made

to Plaintiff on which Plaintiff justifiably relied given their friendship and Defendant's

representations, both to Plaintiff personally and by social media, that both he and the Lounge were financially successful.  The Court likewise finds that Defendant intended to deceive Plaintiff when he made the false representations and that all of this caused Plaintiff's loss of his $28,000.00 at Defendant's hand.  In short, the facts show that Defendant preyed on Plaintiff's naiveté and vulnerabilities as an international student new to the United States, the English language, and American immigration, banking, and business laws.  Thus, Plaintiff is also entitled to a determination of nondischargeability pursuant to § 523(a)(2)(A).

### C.  TCPA

Plaintiff claims that Defendant's conduct violated the TCPA.  The threshold for a claim under the TCPA is that the claimant be a "consumer" as defined by the Act.  Section 47-18-103(1) defines a "consumer" as

> any natural person who seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, services, or property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated or any person who purchases or to whom is offered for sale a franchise or distributorship agreement or any similar type of business opportunity."

Even if Plaintiff qualified as a consumer under the circumstances, courts also look to the nature of the transaction.  The Tennessee Supreme Court has noted that, "[r]elying in part on the Act's [express] purpose of 'maintaining ethical standards of dealing *between persons engaged in business* and the consuming public,' Tenn. Code Ann. § 47–18–102(4) (emphasis added), courts have limited the Act's application to 'transactions between businesses and consumers and not to casual, non-commercial transactions between two individuals.'" *Fayne v. Vincent*, 301 S.W.3d 162, 173 (Tenn. 2009) (quoting *White v. Eastland*, No. 01A01–9009–CV–00329, 1991 WL 149735, at *3 (Tenn. Ct. App. Aug. 9, 1991)).  Thus, the Act does not apply to "sellers [who are] not in the business of selling property as owners or brokers" such that "persons making an

isolated sale of their home are not covered." *Id.* (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn. 1997)). The Tennessee Supreme Court concluded that "a casual sale or transaction is an occasional and isolated sale or transaction by a person who does not hold himself or herself out as being regularly engaged in business of commerce involving the goods, property, or services involved in the sale or transaction." *Id.*

This same reasoning applies to the facts here. Defendant unquestionably was not in the business of offering investment opportunities to consumers. The transaction between Plaintiff and Defendant was an "isolated," "casual, non-commercial transaction[]" that was not the kind of matter that the TCPA was intended to address. Thus, Plaintiff is not entitled to damages under the TCPA.

## III. DAMAGES

In the Sixth Circuit, bankruptcy courts possess the jurisdiction and authority to adjudicate the validity of a claim and award damages, including "compensatory and punitive damages, costs, interest, and attorney's fees" in connection with an adversary proceeding to determine dischargeability. *R & L Pricecorp LLC v. Hall (In re Hall)*, Adv. No. 12-3026, 2013 WL 1739658, at *2 (Bankr. E.D. Tenn. Apr. 23, 2013); *see also In re Copeland*, 291 B.R. at 792 (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)).

### A. Actual Damages

Plaintiff argues that he is entitled to a judgment for actual damages against Defendant in the amount of $28,000.00, representing the funds he lost as a result of Defendant's actions. The Court agrees. As relates to actual damages, the Court finds that Plaintiff loaned or invested $28,000.00 for the sole purpose of installing a kitchen in the Lounge, that Defendant personally and individually took those funds and used them for his own purposes, and that Plaintiff was never

repaid the $28,000.00. Accordingly, Plaintiff is entitled to a judgment against Defendant for actual damages in the amount of $28,000.00, and this judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).

## B. Attorneys' Fees and Expenses

Plaintiff also seeks reimbursement of the attorneys' fees and expenses he has incurred as a result of Defendant's actions; however, under the facts of this case, he is not entitled to recover attorneys' fees. Tennessee courts "'follow the American rule, which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise.'" *In re Morgan*, 415 B.R. at 653 (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005)). Because there is no contractual or statutory basis for awarding attorneys' fees (the Court having found that the TCPA is inapplicable), the Court will not enter a judgment against Defendant for the fees evidenced by Trial Exhibit 46.

## C. Punitive Damages

In addition to actual damages and attorneys' fees and expenses, Plaintiff asks the Court to award him punitive damages against Defendant.[11] Imposition of punitive damages is within the discretion of the bankruptcy court when there is "conduct that is particularly 'egregious, vindictive or intentionally malicious,' 'when there is a strong showing that the defendant acted in bad faith or otherwise undertook [his] actions in reckless disregard of the law,' or upon finding that the actions were 'taken in arrogant defiance of [the] law.'" *In re Wilson*, No. 15-51532-MPP, 2016 WL 3303325, at *10 (Bankr. E.D. Tenn. June 7, 2016) (quoting *Tyson v. Hunt (In re Tyson)*, 450 B.R. 754, 767 (Bankr. W.D. Tenn. 2011)). Tennessee law, similarly, is clear that under the

---

[11] As noted, Plaintiff also asks for treble damages and attorney's fees under the TCPA, but because the Court finds the TCPA inapplicable to these facts, the request for treble damages will be denied.

appropriate circumstances, a court may award punitive damages for particularly egregious conduct. *See Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013).

> Compensatory and punitive damage awards serve vastly different purposes. Compensatory damages are intended to compensate an injured plaintiff for personal injury or property damage and thereby make the plaintiff whole again. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 902 (Tenn. 1992). In contrast, punitive damages are intended to "punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Huckeby v. Spangler,* 563 S.W.2d 555, 558-59 (Tenn. 1978). Punitive damages are thus appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Hodges,* 833 S.W.2d at 901. Evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Id.* at 901 n.3. In other words, the evidence must be such that the truth of the facts asserted be "highly probable." *Teter v. Republic Parking Sys., Inc.,* 181 S.W.3d 330, 341 (Tenn. 2005).

*Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009).

Based on the particularly egregious, callous, and intentional nature of Defendant's actions in his dealings with Plaintiff, the cavalier and patently contradictory manner in which he testified at the trial and in his deposition, and the Court's conclusion that Defendant acted intentionally, willfully, maliciously, and fraudulently, the Court finds that an award of punitive damages in the amount $56,000.00 – double the amount of Plaintiff's actual damages – is warranted and appropriate in this case.

## IV.  CONCLUSION

For these reasons, and pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6), Plaintiff shall be awarded actual damages in the amount of $28,000.00 and punitive damages in the amount of $56,000.00 for a total nondischargeable judgment against Defendant in the amount of $84,000.00.  The Court shall enter judgment consistent with this Memorandum opinion.

FILED:  December 15, 2017

BY THE COURT

*/s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE